UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 3:09-cr-11-RLY-WGH |
| | ) | |
| CHARLES E. MILLER, II, | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Defendant, Charles E. Miller, II ("Defendant"), moves to suppress statements made to law enforcement officers, in addition to evidence discovered as a result of those statements and the search of his vehicle, on April 17, 2009. On December 10, 2010, the court held a hearing on the motion, at which time the court heard testimony from Alec Hensley, Chief of Police of the Oakland City Police Department ("Chief Hensley"), and Southwestern Indiana Violent Crime Task Force Officer Gary Gulledge ("TFO Gulledge"), as well as argument from the parties. After reviewing the evidence and relevant law, Defendant's Motion to Suppress Evidence ("Motion") is **DENIED**.

**I. Facts**

In the afternoon of April 17, 2009, Chief Hensley was on duty in Oakland City, Indiana, which is in Gibson County. (Transcript of December 10, 2010, Hearing on Motion to Suppress ("Transcript") 10:20-24, 11:4-8). While traveling west in his unmarked patrol vehicle on State Road 64, Chief Hensley was alerted over the Gibson

1

County Sheriff's Department's frequency of an armed robbery at the Integra Bank near Arthur Junction, Pike County, five or six miles east of Oakland City. (*Id.* at 11:12-12:10, 19:20-20:10). The alert described the suspect as a tall, thin white male wearing a black mask traveling north from the bank in a white, new Chevy Malibu. (*Id.* at 12:20-23, 13:7).

Chief Hensley began looking for a white car matching that description and proceeded to a location at which anyone traveling west from Arthur Junction would arrive. (*Id.* at 13:3-25). From where he parked, Chief Hensley could see all points from which westbound traffic entered Oakland City. (*Id.* at 14:3-9). No more than five minutes after receiving the first call, Chief Hensley observed a white car traveling around a curve at a moderately higher than normal speed for that stretch of road. (*Id.* at 14:12-15, 19:3-7).

The white car pulled behind Chief Hensley's unmarked patrol vehicle, which is equipped with antennas on the trunk and rear deck lights. (*Id.* at 19:20-20:10). After looking at each other through the mirrors for several seconds, the driver appeared very distressed. (*Id.* at 17:20-18:3). As the car veered to the right around the Chief's vehicle, Chief Hensley noted that the driver was a tall, thin, white male driving a white Chevy Malibu, all of which fit the description of the suspect and getaway car. (*Id.* at 18:9-24). The driver passed cautiously, intentionally turning his head away from Chief Hensley, who was in full uniform with his left police shoulder patch and badge visible. (*Id.* at 18:9-24, 21:6-22:1).

Chief Hensley began to follow the vehicle. (*Id.* at 22:7-8). He then verified the description of the vehicle several times with dispatch and ran the license plate, which was issued in Floyd County in Southeast Indiana. (*Id.* at 23:14-24:2). While traveling west on County Road 100, the driver signaled a left turn at Dongola Road; however, after seeing that the road was a dead end, he turned his signal off and continued to drive straight. (*Id.* at 24:8-19). Due to these observations, Chief Hensley decided to stop the vehicle for further investigation. (*Id.* at 25:16-18).

Conservation Officer Tichenor ("Officer Tichenor") was closest in proximity to Chief Hensley and assisted him in executing a felony stop. (*Id.* at 26:3-27:10). After the driver pulled to the side of the road, Chief Hensley exited his vehicle and observed the driver making furtive movements "like he was grabbing for something at his seat," which made Chief Hensley nervous. (*Id.* at 27:23-28:2). Due to these movements, Chief Hensley drew his weapon and stood behind the door while loudly and clearly instructing the driver to let the Chief see his hands and to throw his keys out of the car. (*Id.* at 27:18-19; 28:2-8). The driver acted as though he could not hear Chief Hensley, even though his window was down. (*Id.* at 28:4-5). Eventually, the driver cooperated by turning off the car, throwing his keys outside the car, and exiting his vehicle. (*Id.* at 28:23-29:2).

Chief Hensley had to tell the suspect several times to turn around and place his hands on his head. (*Id.* at 52:8-9). After the suspect was on his knees with his hands on top of his head, Chief Hensley approached him and placed him in handcuffs. (*Id.* at 29:6-9). As he was performing a pat down for weapons, Chief Hensley asked the driver if he

3

had any weapons in the car. (*Id.* at 29:10-12, 52:22-23). The driver said he did have a weapon in the car. (*Id.* at 29:12). Chief Hensley then asked where the weapon was, and the driver responded that it was underneath the front seat. (*Id.* at 29:12-13). Looking in the driver's side of the Malibu, Chief Hensley saw a weapon on the floorboard beneath the front seat. (*Id.* at 29:16-20). Chief Hensley next looked through the window on the passenger side for other weapons and observed a black bandana-like cloth with two twisted, wrinkled ends underneath a stack of clothes and a hat on the passenger seat. (*Id.* at 29:21-30:10). He also saw the handles of a white, plastic shopping bag sticking up between the seat and console. (*Id.* at 30:11-16).

Before asking the suspect any further questions, Chief Hensley read the defendant his *Miranda* rights from Officer Tichenor's Miranda card. (*Id.* at 30:17-19). After the Defendant said that he understood his rights, Chief Hensley asked, "Do you have like a large amount of cash in your car?" (*Id.* at 31:3-7). The Defendant replied, "Yes." (*Id.* at 31:8). Then, Chief Hensley inquired, "Did you just rob the Integra Bank at Arthur Junction?" (*Id.* at 31:10). Defendant dropped his head and said, "No." (*Id.* at 31:11). At this point, other officers began to arrive on the scene, and Chief Hensley identified the Defendant by his driver's license as Charles E. Miller, II. (*Id.* at 33:14-21). The Defendant was not free to leave, and Indiana State Trooper W. W. George ("Trooper George") took charge as the lead investigator. (*Id.* at 34:11-16, 35:22-36:3).

On his way to the location, Trooper George conducted a telephone interview of Chief Hensley to get his account of the initial stop. (*Id.* at 37:8-12, 40:13-20). Trooper

4

George then filed an unsworn supplemental case report of the initial stop based on his conversation with Chief Hensley. (*Id.* at 47:1). The Indiana State Police ("ISP") called a crime scene tech to the location who placed evidence tape on all access points to the car and transported the vehicle to ISP Post 35 on Highway 41 in Evansville, Indiana. (*Id.* at 35:2-11). That night, TFO Gulledge executed a detailed search of the vehicle pursuant to a warrant. (*Id.* 68:11-21).

## II.   Discussion

In his Memorandum in Support of the Motion to Suppress Evidence ("Memorandum"), Defendant alleges that Chief Hensley conducted an illegal search of his automobile and illegal interrogation in violation of his Fourth and Fifth Amendment rights, respectively. Although Defendant alleges an illegal stop and detention, as well as violations of his Sixth and Fourteenth Amendment rights, in the Motion, these claims are merely conclusory statements of law and are not addressed in the supporting Memorandum. Accordingly, the court considers Defendant's silence on these claims as a concession and will focus only on the arguments presented in the Memorandum.

First, Defendant asserts that Chief Hensley's failure to advise Defendant of his *Miranda* rights prior to questioning him about a weapon constitutes an illegal custodial interrogation; therefore, any evidence tainted by the interrogation should be suppressed. Defendant also asserts that the evidence obtained due to Chief Hensley's subsequent partial search of his vehicle should be suppressed not only because it was obtained as a result of the illegal interrogation, but also because the exception for warrantless

5

automobile searches does not apply. Finally, Defendant questions the credibility of Chief Hensley's testimony due to discrepancies between the testimony and Trooper George's supplemental report of the events of April 17, 2009.

### A. Miranda Rights

Defendant argues that the pre-*Miranda* warning questions asked by Chief Hensley were not permissible under the public safety exception to *Miranda*, because Defendant was handcuffed and the vehicle was out of reach; therefore, Defendant did not present a continuing threat to the officers at the scene or the general public. Under the public safety exception to *Miranda*, "police officers can ask a suspect questions without first giving *Miranda* warnings if they reasonably believe it is 'necessary to secure their own safety or the safety of the public.'" *United States v. Are*, 590 F.3d 499, 505 (7th Cir. 2009) (citing *New York v. Quarles*, 467 U.S. 649, 659 (1984)). The public safety exception may also apply to weapon-related pre-*Miranda* questions, even if a suspect is handcuffed and has been searched for weapons. *Id.* at 506; *United States v. Edwards*, 885 F.2d 377 (7th Cir. 1989). Given the dangers inherent in all traffic stops, "the government's interest in officer safety outweighs a motorist's interest in not being asked about the presence of loaded weapons," despite the fact that the suspect is outside the vehicle. *United States v. Holt*, 264 F.3d 1215, 1226 (10th Cir. 2001).

In *Edwards*, the Seventh Circuit decided that an officer asking the defendant, who was handcuffed and had been searched for contraband, if he had a weapon that might pose a threat to the detective or others in the area was appropriate. *Edwards*, 885 F.2d at

384. The Court relied on the inherent knowledge that drug dealers typically arm themselves, especially when dealing drugs. *Id.* Under the public safety exception to *Miranda*, the question was appropriate, and the defendant's statements in response were admitted. *Id.*

Here, Chief Hensley's questions to Defendant regarding weapons in the car fall within the public safety exception to *Miranda* due to concerns for his own safety and the public's safety. Although Defendant was being handcuffed at a distance from the car, Chief Hensley suspected Defendant had just committed an armed robbery. Like *Edwards*, Chief Hensley relied on the knowledge provided by dispatch that the bank robber was armed. *See id.* While Chief Hensley believed Defendant to be the car's only occupant, the chance that an accomplice might be located in the car with a weapon still existed. The Defendant made furtive movements as though reaching for something prior to exiting the vehicle and hesitated in following instructions, heightening Chief Hensley's safety concerns. For these reasons, Chief Hensley reasonably believed that weapons located in the vehicle were relevant to officer safety. *See Holt*, 264 F.3d at 1225 (finding that if the interior of the vehicle is relevant to officer safety and treated as within the motorist's immediate control even after a motorist has been ordered out of the vehicle and placed under arrest for the purposes of a search incident to arrest, the same is true for the public safety exception to *Miranda*) (citing *New York v. Belton*, 453 U.S. 454, 457, 462 (1981)). Chief Hensley's questions were "reasonably prompted by a concern for the public safety." *See Quarles*, 467 U.S. at 656. Accordingly, the questions and

Defendant's answers are admissible as evidence.

B. **Automobile Search**

Defendant's claim that Chief Hensley's partial search of Defendant's automobile was tainted by an illegal interrogation fails, because the interrogation was not illegal; however, Defendant asserts that despite the legality of the interrogation, Chief Hensley's warrantless search does not fall under the automobile exception and was therefore illegal. Not only does Defendant argue that Chief Hensley did not have probable cause to search the vehicle, he also insists that the automobile exception includes a separate exigency requirement that was not met.

While the Fourth Amendment generally requires police to obtain a warrant before conducting a search, an exception exists for the search of vehicles. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (citing *Carroll v. United States*, 267 U.S. 132, 153 (1925)). Under the automobile exception, a vehicle may be searched without a warrant if there is probable cause to believe the vehicle contains contraband or evidence of illegal activity. *Id.* at 466-67; *California v. Carney*, 471 U.S. 386, 390 (1985); *United States v. Washburn*, 383 F.3d 638, 641 (7th Cir. 2004). Probable cause to search exists when an officer is more likely than not to find contraband or evidence of illegal activity at a specified location based on the totality of the circumstances. *Washburn*, 383 F.3d at 642 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. McClinton*, 135 F.3d 1178, 1183 (7th Cir. 1998)). The Supreme Court has clearly held that "the automobile exception has no separate exigency requirement." *Dyson*, 527 U.S. at 466.

Because Chief Hensley had probable cause to search Defendant's vehicle and no exigent circumstance is required, the search falls squarely within the automobile exception. Defendant fit the physical description of the bank robber, was driving the make and model of the getaway car, became distressed after glimpsing Chief Hensley in his uniform and unmarked car, drove in an overly-cautious manner while avoiding dead end streets while being followed by the Chief, and made furtive movements before leaving the vehicle. Chief Hensley knew the bank robber was armed, increasing the probability that a gun was in the vehicle. Also, because exigency is not required, the inaccessability of the vehicle to the handcuffed Defendant does not negate Chief Hensley's ability to search the car under the automobile exception. *Washburn*, 383 F.3d at 642. These facts known to Chief Hensley at the time of the search, combined with Defendant's admission of the presence of a gun, supply probable cause to believe that the vehicle contained contraband and evidence of the bank robbery.

Defendant also attempts to paint Chief Hensley's warrantless automobile search as improper due to the fact that the state police investigators decided to obtain a warrant prior to conducting a detailed search of the automobile; however, this claim has little merit. Because Chief Hensley had probable cause to search the vehicle under the automobile exception, he could have searched all areas in the vehicle in which contraband or evidence of criminal activity might be found. *See United States v. Zahursky*, 580 F.3d 515, 523 (7th Cir. 2009) ("Where law enforcement officers have probable cause to search a vehicle, they may search all areas in the vehicle in which contraband or evidence of

criminal activity might be found, including closed containers, packages, compartments, and trunks."). If Chief Hensley was authorized to search the car's compartments and trunks, he certainly was authorized to observe objects in plain view through the open door of the driver's side and the window of the passenger side of the car.[1]

Chief Hensley had probable cause to search Defendant's vehicle for contraband and evidence of criminal activity; therefore, the search was lawful under the automobile exception.

### C. Chief Hensley's Credibility

Finally, Defendant questions the credibility of Chief Hensley's testimony due to discrepancies between his testimony describing the events of April 17, 2009, and Trooper George's supplemental report recounting the same events. The court accepts Chief Hensley's testimony as the most accurate account for the following reasons. First, the supplemental report was written by Trooper George, not Chief Hensley, and was not a sworn statement. (Defendant's Ex. A). Second, although Trooper George's report was based on a conversation with Chief Hensley, that conversation was not recorded and occurred while Trooper George was en route to the scene, leaving him unable to take notes and increasing the chance of discrepancies. Third, the differences highlighted by Defendant are not material, especially considering the testimony and report were given by different people.

---

[1] Even if the gun was under the seat and not in plain view as Defendant claims, Chief Hensley could have searched under the seat for the gun. *See Zahursky*, 580 F.3d at 523.

For example, Defendant notes that Chief Hensley testified that the color of the bandana-like cloth in the passenger seat of the car was black, yet the inventory report lists that item as blue; however, the difference between black and blue is not always readily apparent. Also, Chief Hensley testified that Defendant signaled a left hand turn on Dongola Road, while Trooper George's report indicates Defendant signaled to the right; yet this discrepancy could easily be explained by the report's secondhand nature. Similarly, Trooper George might have mistaken the order of the questioning and reading of *Miranda* rights by Chief Hensley when he reported that Defendant was *Mirandize*d prior to any questioning, whereas Chief Hensley testified that Defendant was asked about a gun prior to being *Mirandized*. The same logic applies to Trooper George's omission of Chief Hensley's observation of the gun in plain view on the floorboard under the seat. Defendant claims that Trooper George's report that the gun was underneath the seat contradicts Chief Hensley's testimony that the gun was visible through the open car door "underneath the seat on the floor"; however, the gun was photographed exactly where it was found, which was on the floorboard below the driver's seat, exactly as Chief Hensley testified. (Government's Ex. B-4; Transcript at 29:16-20, 71:10-16). Additionally, the absence in the report of any mention of the Floyd County license plate or the Defendant wearing sunglasses and a baseball cap is immaterial.

Chief Hensley's testimony is the only firsthand account of the events of April 17, 2009, and the court finds his testimony credible.

## III. Conclusion

Based on the foregoing reasons, Defendant's Motion to Suppress Evidence (Docket # 46) is **DENIED**.

**SO ORDERED** this 19th day of February 2011.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic copies to:

John Andrew Goodridge
John Andrew Goodridge Law Office
jagoodridge@att.net

Todd Stanton Shellenbarger
UNITED STATES ATTORNEY'S OFFICE - EV
Todd.Shellenbarger@usdoj.gov